

January 15, 2021

**Via Electronic Mail**

U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street, S.W.
Washington, D.C. 20536-5009
ice-foia@ice.dhs.gov

Boston Field Office
ICE Enforcement and Removal Operations
1000 District Avenue
Burlington, MA 01803
Boston.Outreach@ice.dhs.gov

> **RE: Freedom of Information Request Regarding Immigration Detention and Transfers**

To Whom It May Concern,

The American Civil Liberties Union of Maine Foundation ("ACLU of Maine"), the Immigrant Legal Advocacy Project ("ILAP"), and the Refugee and Human Rights Clinic ("RHRC") of the University of Maine School of Law, (collectively, "Requesters"), submit this letter as a request for information under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. This request seeks information pertaining to transfers of immigrant detainees to and from facilities in Maine, particularly during the COVID-19 pandemic. Thus, we request production of all records and documentation related to the scope of this request from the period of March 1, 2020, to the present (unless stated otherwise in a specific request below).

Requesters seek expedited processing of this request, pursuant to 5 U.S.C. § 552(a)(6)(E), and a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 5 U.S.C. § 552(a)(4)(A)(ii)(II).

## I.    Background

The purpose of this request is to obtain information about ICE detention in Maine, including transfers of ICE detainees to and from Maine, during the COVID-19 pandemic. Despite the dangers of detention in closed congregate settings during the pandemic, and the

heightened risks of spreading COVID-19 between facilities[1], ICE transfers to and from the Cumberland County Jail in Portland, Maine dramatically increased during the pandemic. Specifically, after facing lawsuits in multiple ICE facilities in New England,[2] ICE started a new practice of using Cumberland County Jail as a short-term transfer facility. As monitored by law students in the RHRC and other advocates, starting in June 2020 ICE began transferring ICE detainees from elsewhere in New England to the Cumberland County Jail in Maine, only to quickly transfer them out of state, mostly to facilities in Louisiana, Texas, and other locations with heightened COVID-19 risks. This practice exposed detainees and communities alike to risk of infection with COVID-19.

ICE pursued this practice despite knowing the dangers associated with such transfers, dangers which are reflected by ICE policy. According to ICE's current COVID-19 Pandemic Response Requirements, transfers between facilities are prohibited unless "necessary" for a limited number of purposes, such as "medical evaluation," "medical isolation/quarantine," or "to prevent overcrowding."[3] "Detainee transfers for any other reason require justification and pre-

---

[1] From April to August 2020, people detained by ICE faced infection rates 13 times higher than that of the general U.S. population—even higher than the infection rate in other closed congregate settings like federal and state prisons. *See* Adrianna Rodriguez, *'A stain on our country': ICE efforts to stop COVID-19 spread fail to protect immigrant detainees from virus*, USA Today (Nov. 11, 2020), available at https://www.usatoday.com/story/news/health/2020/11/11/covid-ice-detainee-case-rate-higher-than-general-us-study/6220333002/ (citing Parsa Erfani, *et al.*, *COVID-19 Testing and Cases in Immigration Detention Centers*, JAMA Research Letter, April-August 2020 (Oct. 29, 2020), https://jamanetwork.com/journals/jama/fullarticle/2772627#:~:text=From%20April%20to%20August%202020%2C%20the%20mean%20monthly%20case%20rate,2.0%20to%206.9%20per%20month).

[2] *See, e.g.*, *Yanes v. Martin*, No. 120CV00216MSMPAS, 2020 WL 3047515 (D.R.I. June 2, 2020) (in a class habeas action by ICE detainees in Wyatt Detention Facility in Rhode Island, ordering individualized bail hearings for ICE detainees); *da Silva Medeiros v. Martin*, No. CV 20-178 WES, 2020 WL 2104897, at *1 (D.R.I. May 1, 2020) (in habeas corpus petitions on behalf of medically vulnerable ICE detainees, granting relief enjoining ICE from transferring petitioners outside the Court's jurisdiction throughout the action and granting their immediate release); *Gomes v. US Dep't of Homeland Sec., Acting Sec'y*, No. 20-CV-453-LM, 2020 WL 2514541 (D.N.H. May 14, 2020) (in emergency habeas petition, holding that that detainees whose age or health conditions placed them at high risk for serious illness or death from exposure to COVID-19 were entitled to bail hearings); *Quadrelli v. Moniz*, No. 20-CV-10685-ADB, 2020 WL 3051778 (D. Mass. June 8, 2020) (granting class certification for a habeas corpus petition by ICE detainees in a certain unit of the Plymouth County Correctional Facility); *Savino v. Souza*, 459 F. Supp. 3d 317, 2020 WL 2404923 (D. Mass. May 12, 2020) (requiring universal testing of ICE detainees, prohibiting new immigration detention in Bristol County House of Correction, prohibiting transfer out of Bristol County until individuals are tested).

[3] *COVID-19 Pandemic Response Requirements*, U.S. Immigration and Customs Enforcement, (Oct. 27, 2020), available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (stating "Transfers of ICE detainees and non-ICE detained populations to and from other jurisdictions

approval from the local ERO Field Office Director."[4] Any "transfers must have cleared quarantine protocols and be cleared by ICE Health Services Corps."[5] A prior version of the policy before October 27, 2020, had required "limiting" such transfers.[6]

Despite these rules to limit or discontinue transfer, ICE transfers to and from Cumberland County Jail dramatically increased from June to December 2020. Not only did this practice expose ICE detainees to an increased risk of COVID-19 from repeated transfers in unhygienic conditions, and transfer to areas with higher COVID-19 prevalence, but the out-of-state transfers into Cumberland County Jail also increased the risk of introducing COVID-19 into the state of Maine, which had experienced among the lowest COVID-19 rates in the United States throughout the summer.

On October 23, 2020, a lawsuit was filed on behalf of an ICE detainee, Antony Jose Canela Rodriguez, who ICE had transferred from out of state to the Cumberland County Jail. *See* Compl., *Rodriguez v. Wolf*, Docket No. 20-cv-393-LEW (D. Me. Oct. 23, 2020). Mr. Canela Rodriguez sought relief against transfer to the southern United States and the corresponding COVID-19 risks associated with unsanitary transport and detention through multiple facilities, in an area with higher COVID-19 risks. Another court recently ruled that a similar ICE transfer likely violated the detainee's Fifth Amendment rights. *See Dorce v. Wolf*, Docket No. 20-cv-11306, 2020 WL 7264869 (D. Mass. Dec. 10, 2020). After admitting that they had been planning to transfer Mr. Canela Rodriguez, ICE officials agreed to keep Mr. Canela Rodriguez in Massachusetts during the pendency of immigration court proceedings.

Even after the lawsuit, ICE continued its practice of using Cumberland County Jail as a short-term facility in a chain of dangerous inter-facility transfers, until the Cumberland County Jail put a stop to the practice. The Cumberland County Jail issued a moratorium on out of state transfers into the facility starting December 7, 2020. On December 4, 2020, an official from the Cumberland County Jail notified ICE officials that "**ALL Out of State Transfers and/or Field Arrests** will *not* be accepted at CCJ beginning Monday, December 7, 2020."[7] (emphasis in original).

---

and facilities are discontinued unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release or removal, or to prevent overcrowding. Detainee transfers for any other reason require justification and pre-approval from the local ERO Field Office Director. Detainee transfers must have cleared quarantine protocols and be cleared by ICE Health Services Corps.").

[4] *Id.*

[5] *Id.*

[6] COVID-19 Pandemic Response Requirements, U.S. Immigration and Customs Enforcement (September 4, 2020 version), available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v4.pdf.

[7] The notice added that once ICE had additional testing capacity, CCJ was "open to having a follow-up discussion to accepting Out of State Field Arrests, but Facility transfers will still *not*

In parallel with ICE's pattern of unnecessarily exposing detainees to COVID-19, ICE is moving ahead with plans to construct another ICE facility in Scarborough, Maine. According to ICE documents released to the press, the planned facility would be used to "process fingerprint, and detain people" for up to 12 hours.[8] Given ICE's recent practice of using Maine as a stop-over facility for out-of-state transfers, a practice which heightens the risk of COVID-19 spread, more information is needed about this new ICE facility in Maine.

This record request seeks records to provide necessary public oversight into ICE's treatment of detainees in Maine during the COVID-19 pandemic, as well as ICE's future plans to create a new detention facility in the state.

## II.    Definitions

For the purposes of these requests, the following are defined as:

**"ICE's COVID-19 Pandemic Response Requirements"** – This term refers to ICE's Enforcement and Removal Operations COVID-19 Pandemic Response Requirements, available on ICE's website, including the April 10, 2020 version[9], the June 22, 2020 version[10], the July 28, 2020 version[11], the October 27, 2020 version[12], and any future versions of the document.

**"ICE facility in Scarborough"** – This term refers to a facility in Scarborough, Maine governed by a lease between Maine Realty Advisors and the General Services Administration, being developed for the Department of Homeland Security and Immigration and Customs Enforcement to detain people suspected of immigration violations.

---

be accepted." In-state arrests or transfers within the State of Maine would continue to be accepted, as before the June 2020 change in ICE practices.

[8] Nick Schroeder, *Construction for Covert ICE Facility in Scarborough Resumes after Complaints*, Bangor Daily News (Dec. 15, 2020), https://bangordailynews.com/2020/12/15/news/portland/construction-for-covert-ice-facility-in-scarborough-resumes-after-complaints/.

[9] Available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v1.pdf.

[10] Available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v2.pdf.

[11] Available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities-v3.pdf.

[12] Available at https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

**"ICE Detention Facilities in Maine"** – This term refers to any facility in Maine that ICE uses for overnight detention of ICE detainees, including, but not limited to, Cumberland County Jail.[13]

**"Record(s)"** - Should be read in the broadest sense plausible and includes any writings, photographs, videos, electronically-stored material, data compilations, recordings, or any other material. This includes any documentation in your actual or constructive control, custody or possession, including documentation accessible at your request, whether prepared for or by you or someone else whom you can obtain the information from. This includes, but is not limited to, business records, policy manuals, checklists, internal guidance, case notes, voicemail transcripts, instant messages, disciplinary notes, training manuals, photographs, videos, electronically-stored materials, documented conversations, social media posts or comments, messages, phone call logs, financial interests, notices, desk pads, work notes, minutes, emails, pamphlets, employee records, drawings, sketches, working papers, handwritten notes, formal or informal policies, procedures, and guidelines, or any other written or recorded, filmed, transcribed, or graphic matters accessible to you in any capacity.

Unless otherwise defined above, words used within the requests for production below should be given their ordinary meaning.

## III.    Records Requested

Unless otherwise specified, all records are requested for the time period from March 1, 2020, through the present.

1. Any records approving transfers of ICE detainees to or from ICE Detention Facilities in Maine, including, but not limited to, approval or clearance for transfers as required by ICE's COVID-19 Pandemic Response Requirements.

2. Any records documenting transfers of detainees to or from the Cumberland County Jail, including, but not limited to Form I-203 (Notice to Detain or Release) and Form I-216 (Record of Person and Property Transfer).

3. Any records concerning communications with the Cumberland County Jail regarding transfers of ICE detainees, including but not limited to electronic communications such as emails and fax between employees of ICE and the Cumberland County Jail.

4. Records regarding precautions for transferring ICE detainees to or from the Cumberland County Jail, including, but not limited to, testing, vaccination, physical distancing, and hygiene measures.

5. Any records from June 2019 to the present regarding the lease and development plans for the ICE facility in Scarborough.

---

[13] It is the Requesters' understanding that Cumberland  County Jail is the sole facility that ICE routinely uses for overnight detention of ICE detainees; however, the broader reference to "ICE detention facilities in Maine" is used to encompass any other facilities that ICE may use for overnight detention.

6. Any records from June 2019 to the present relating to zoning approval for the ICE facility in Scarborough.

7. Any records from June 2019 to the present regarding plans for immigration detention at the ICE facility in Scarborough.

8. Any records regarding policies for immigration detention at the ICE facility in Scarborough.

## IV.   Format of Production

With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), we request that responsive documents be provided electronically in their native format (*e.g.*, Excel spreadsheets in Excel). We request that any responsive documents for which native format production is impossible be provided *electronically* in text-searchable, static-image format (PDF), in the best image quality the agency can produce. Please provide the requested documents in the following format:

- Saved on a CD, CD-ROM, DVD, or USB;
- Each record in a separately saved file;
- Emails should include date and time stamps and author and recipient information, including BCC and any other hidden fields, and "parent-child" relationships should be maintained, meaning that the Requesters must be able to identify the attachments with emails;
- With any other metadata preserved.

## V.   The Requesters

The ACLU of Maine is a non-profit, 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about the civil rights and civil liberties implications of government activities and policies.

ILAP is Maine's only state-wide immigration legal services organization. In that role, ILAP advances justice and equity for immigrants and their families through direct legal services, community education, and systemic advocacy.

RHRC is one of four clinical programs in the Cumberland Legal Aid Clinic at the University of Maine School of Law. In the RHRC, students serve as the attorneys assisting low-income immigrants through a broad range of cases and projects. The clinic targets a critical gap in access to justice – providing direct legal representation and broader advocacy to immigrants and refugees seeking political asylum and similar protections under federal law, while training future attorneys on how to best serve the legal needs of immigrants.

## VI.   Request for a Waiver of the Costs

Requesters ask that the agency waive all fees associated with the request. A waiver is warranted because the disclosure of information is "likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(iii).

### A.  Disclosure of Information is in the Public Interest

Disclosure of the information is in the public interest because it will contribute significantly to public understanding of ICE's detention practices in Maine during COVID-19, as well as its planned detention practices in the future. Given the concerns with existing treatment of ICE detainees, the possibility that ICE could use a separate facility to evade existing scrutiny is of serious public interest. The concern is also time-sensitive, given the ongoing dangers posed by COVID-19 to people in ICE custody, and imminent development of the ICE facility in Scarborough, Maine.

Such information is of great public interest because it affects a large population of individuals: not only ICE detainees throughout New England, but also people who live and work in the greater Portland area, who are exposed to heightened risk by COVID-19 outbreaks in their community. *See* 6 C.F.R. § 5.11(k)(2)(iii) (stating that disclosure contributes to public understanding when it affects a "reasonably broad audience of persons interested in the subject"). Additionally, similar articles and reports have already been created by other organizations regarding immigration matters that the public has taken interest in.[14] Requesters have the ability, intent, and means to disseminate the requested information to the public at large.

Requesters will review, analyze and/or summarize the information obtained through this FOIA internally and may make the information available through their publicly accessible websites and through action alerts, social media, emails and newsletters. Finally, Requesters have frequent contact with regional and national print and news media and plan to share

---

[14] *See e.g.* Gregory Hooks, Bob Libal, et al., *Hotbeds of Infection: How ICE Detention Contributed to the Spread of COVID-19 in the United States* at 3, Detention Watch Network (Dec. 2020), available at https://www.detentionwatchnetwork.org/sites/default/files/reports/DWN_Hotbeds%20of%20Infection_2020_FOR%20WEB.pdf; John Washington, *ICE Mismanagement Created Coronavirus 'Hotbeds of Infection' In and Around Detention Centers*, The Intercept (Dec. 9, 2020), available at https://theintercept.com/2020/12/09/ice-covid-detention-centers/; Adrianna Rodriguez, *'A stain on our country': ICE efforts to stop COVID-19 spread fail to protect immigrant detainees from virus*, USA Today (Nov. 11, 2020), available at https://www.usatoday.com/story/news/health/2020/11/11/covid-ice-detainee-case-rate-higher-than-general-us-study/6220333002/ (citing Parsa Erfani, et al., *COVID-19 Testing and Cases in Immigration Detention Centers*, JAMA Research Letter, April-August 2020 (Oct. 29, 2020), https://jamanetwork.com/journals/jama/fullarticle/2772627#:~:text=From%20April%20to%20August%202020%2C%20the%20mean%20monthly%20case%20rate,2.0%20to%206.9%20per%20month).

information gleaned from FOIA disclosures with interested media, further guaranteeing that the information will be publicly accessible.

### B. Disclosure of Information is Not Primarily in the Commercial Interest of the Requesters

Requesters are not-for-profit organizations. Attorneys, noncitizens and any other members of the public may obtain information about immigration issues through the Requesters' distribution of oral, written, and electronic materials, including their respective websites, and through public appearances. Requesters seek the requested information for disseminating it to the public-at-large who have access to our public websites and other free publications; not for commercial gain.

## VII.    Request for a Limitation of Search and Review Fees

Requesters seek a limitation of processing fees because of their qualification as "representatives of the media" pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by . . . educational or noncommercial scientific institution . . . or a representative of the news media") and 6 C.F.R. § 5.11(d)(1) (search fees shall not be charged to "representatives of the news media"). "'[A] representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(III).

Courts have previously found that the ACLU is considered a "representative of the media" for FOIA-related purposes. *See ACLU of Wash. v. U.S. Dep't of Justice*, No. C09-0642RSL, 2011 WL 887731, at \*10 (W.D. Wash. Mar. 10, 2011) (finding that Washington's ACLU was an organization that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"); *ACLU v. DOJ,* 321 F. Supp. 2d 24, 30 n.5 (D. D.C. 2004) (finding nonprofit public interest group to be "primarily engaged in disseminating information").

Per the statutory definition, the Requestors do not have to be a part of the traditional media; instead, if the requester meets the definition in any aspect of its work, it qualifies for fee limitations. *See Cause of Action v. FTC*, 799 F.3d 1108, 1125 (D.C. Cir. 2015). Requesters qualify as a "representative of the news media" under the statute, because they routinely gather information for public interest, turn it into distinct work, and publicly distribute this work. *See Electronic Privacy Information Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees). Courts have reaffirmed that non-profit requesters that are not traditional media outlets can qualify as media for FOIA-related purposes. *See Cause of Action v. FTC*, 799 F.3d 1108, 1125 (D.C. Cir. 2015). Thus, fees must be limited to duplication costs.

## VIII.   Expedited Processing

Expedited processing of this request is required because there is a "compelling need" for the information. 5 U.S.C. § 552(a)(6)(E)(i)(I). A "compelling need" is established when there exists an "urgency to inform the public concerning actual or alleged Federal Government activity," when the requester is a "person primarily engaged in disseminating information," 28 C.F.R. § 16.5(e)(1)(ii), and when "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence" exists. 28 C.F.R. § 16.5(e)(1)(iv).

There is an urgent need for public information regarding ICE's practices exposing detainees to increased risk of infection with COVID-19. Even as vaccinations are being rolled out across the state and the country, record numbers of people are dying from COVID-19, and many more experience long-term consequences from the virus. It is well-documented that ICE's detention practices have created dangerous and unnecessary spread of the virus, *see supra* nn. 1 & 13, and, as the emergency continues, there is a compelling need for the public to have information relating to ICE's practices in Maine, including the practice of inter-state transfers of ICE detainees.

Likewise, the dangers of ICE detention during the pandemic demonstrate that oversight is necessary into any new detention facilities. ICE's detention practices create risks to detainees and to the communities in which their facilities are located. Accordingly, there is a compelling need for the public to have access to information regarding the ICE facility being developed in Scarborough, Maine.

## IX.   Certification

The Requesters certify that the above information is true and correct to the best of the Requesters' knowledge. *See* 6 C.F.R. § 5.5(e)(3).

Please furnish the applicable records to:

**Emma E. Bond, Esq.**
**ACLU of Maine**
**P.O. Box 7860**
**Portland, Maine 04112**
**ebond@aclumaine.org**

10

Respectfully submitted,

Emma Bond, Legal Director
ACLU of Maine

Anna Welch, Director
Refugee and Human Rights Clinic

/s/ Philip Mantis
Philip Mantis, Legal Director
Immigrant Legal Advocacy Project

10